**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CASE. NO. 20-CR-083** |
| | : | |
| | : | |
| **DANIEL GREGORY JOHNSTON,** | : | |
| **Defendant.** | : | |

**UNITED STATES' SENTENCING MEMORANDUM**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully files this memorandum to aid the Court in its sentencing proceeding.

## I.     Background

 Over the course of a few months in the spring of 2018, the Defendant used his computer and a file-sharing software program to collect and distribute images and videos depicting the sexual abuse of very young children.  *See* Presentence Investigative Report ("PSR") ¶¶ 11-12. During this time, law enforcement, acting in an undercover capacity, were able to connect to this offender's computer and download over 200 images and videos containing child sexual abuse material.  PSR ¶ 12.   The content of these materials is shocking.  One video depicts a five to six-year-old little girl, being forced to put her mouth on an adult man's penis.  *Id.* at ¶ 13.  Another shows a child bound by her hands and feet to a bed, while an adult man rapes her.  *Id.*

In June of 2018, law enforcement obtained a search warrant for the Defendant's residence. PSR ¶ 15.  When interviewed by law enforcement, the Defendant admitted to using his laptop and file-sharing software to download images and videos depicting the sexual abuse of children.  *Id.* While doing so, this offender understood that by using this file-sharing software, other pedophiles could access the child sexual abuse material that was stored on his computer.  *Id.*  The Defendant

acknowledged that this was not a one-time mistake.   Rather, he admitted that he began downloading this disturbing material "a few years ago."  *Id.*   He claimed that most of the videos he viewed depicted early teenaged girls, which is contradicted by the forensic evidence in this case, later admitting to viewing child sexual abuse videos showing children as young as nine being sexually assaulted.  *Id.*   This offender admitted that he engaged in a cycle of downloading child sexual abuse materials, viewing them, feeling some remorse, and then deleting the videos.  *Id.* Despite claiming to feel guilty about exploiting innocent young children, the Defendant admitted that, after a few days, he would download more child pornography and repeat the cycle.  *Id.*

Various digital devices were seized from this Defendant's home, which were then forensically examined by a computer forensic specialist. PSR ¶ 16.  Consistent with the Defendant's admissions, file names found in the "Recycle Bin" of his laptop revealed the disturbing nature of the material that this Defendant viewed for his own sexual gratification.  *Id.* The file names clearly describe the sexually abusive nature of the videos this Defendant sought out, downloaded, viewed, and made available to other like-minded offenders.  *Id.*  Other forensic artifacts show that this Defendant downloaded and viewed videos showing children bound with ropes and metal restraints, being vaginally raped by adult men.  *Id.* at ¶ 17.  Other images that this Defendant viewed and shared with others show an adult man putting his penis into a prepubescent girl's mouth.  *Id.*

On September 2, 2021, the Government filed a Superseding Information charging the Defendant with the Possession of Child Pornography.   *See* Dkt. Entry 35.  He is scheduled to plead guilty and be sentenced on November 2, 2021.

## II.   A Guidelines Sentence of 97 to 121 Months Accurately Reflects the 3553(a) Factors

In determining a reasonable sentence, the Court must consider the factors listed in 18

U.S.C. § 3553(a).[1]  These factors include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed –
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; and
> (3) the kinds of sentences available;
> (4) the applicable sentencing guidelines range for the offense;
> (5) pertinent policy statements issued by the U.S. Sentencing Commission;
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a); *see also United States v. Pyles*, No. CR 14-00006 (RJL), 2020 WL 376787,

at *2 (D.D.C. Jan. 23, 2020); *United States v. Mitchell*, No. CR 05-00110 (EGS), 2019 WL

2647571, at *7 (D.D.C. June 27, 2019).  A district court, however, "need not consider every §

3553(a) factor in every case." *In re Sealed Case*, 527 F.3d 188, 191 (D.C. Cir. 2008); *see also*

*United States v. Fry*, 851 F.3d 1329, 1332 (D.C. Cir. 2017).

### A. The Nature and Circumstances of the Offense Demand a Guidelines Sentence

There is no doubt that the Defendant's criminal conduct is egregious, and his offenses

have been perpetrated against the most vulnerable members of our society - children.  Children

captured in images and videos depicting their sexual abuse are traumatized and victimized in the

---

[1] "Since the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 160 L.Ed.2d 621 (2005), the Guidelines serve only an advisory function. *Id.* at 245, 125 S. Ct. 738. Nevertheless, even in a post-*Booker* world in which the Guidelines are not binding, the sentencing court 'must calculate and consider the applicable Guidelines range" as its starting point.

worst way imaginable at the time the images were created, and they are re-victimized and re-traumatized each and every time an individual, like the Defendant, views the images for their own sexual gratification. As eloquently explained by the Sixth Circuit in a child pornography case:

> ...we have numerous victims in a case like this, not one victim. Every image of a child, every image of a non-adult engaged in any type of sexual activity or any type of pose without clothing or any type of exploitation constitutes an additional case of victimizing a child. Without a demand for that type of information and that type of viewing from persons like this defendant, we don't know how many child abuse cases we could prevent. And as long as there is a demand to purchase images of child pornography, there is going to be an unending stream of child abuse of…children who are forced into these roles.
>
> ...every image has a child who has been exploited and abused, and that is the concern I have. It is the concern that I have when people are engaged in serially doing this, the effect it has on children throughout the world and the effect it has on their future lives.

*See United States v. Miller*, 665 F.3d 114, 121-122 (6th Cir. 2011)(quoting the district court) (rejecting an attack on the child pornography sentencing guidelines and highlighting the grave harm caused to the victims depicted in child pornography images and the evidence that traffickers and possessors of child pornography are the impetus for the creation of more sexual abuse of minors).  In the present case, the Defendant's laptop contained forensic artifacts, including files in the "Recycle Bin" and LNK files that show that he accessed and viewed countless images depicting the sexual abuse of very young children.  What's worse is that this offender made this abusive and exploitative material available to countless other individuals to download and view for their own sick, sexual gratification.  Every image and video that this Defendant sought out, viewed, and passed along, represents an innocent child victim who had the worst moments of their lives forever memorialized and spread to countless offenders all over the world, thanks to the Internet.  *See Blinkinsop*, 606 F.3d at 1118 (finding that "[t]he children involved in pictorial and cinematic pornography additionally endure ongoing harm because their

images have been preserved in a permanent medium").  In *New York v. Ferber*, the U.S.

Supreme Court noted:

> [P]ornography poses an even greater threat to the child victim than does sexual abuse or prostitution.  Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place.  A child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography.

458 U.S. 747, 759 n.10 (1982), *quoting* Shouvlin, *Preventing the Sexual Exploitation of Children: A Model Act*, 17 Wake Forest L.Rev. 535, 545 (1981).

As set forth above, this Defendant has demonstrated that he has a sexual interest and attraction to young, vulnerable children.  Despite claiming to feel "guilty" for the behavior he engaged in over the course of the past few years, he repeatedly continued to engage in this egregious criminal conduct until he was discovered by law enforcement.  Given the serious nature of the Defendant's criminal conduct, a Guidelines sentence of between 97 to 121 months is appropriate.

**B.  History and Characteristics of the Defendant**

This offender stands before the Court having had opportunities that the majority of defendants do not.  He has a college degree, and a history of steady, high-paying, employment.  *See* PSR ¶ 52.  It appears that he had a supportive partner, who was living with him at the time law enforcement executed his search warrant at his home in June of 2018.  *Id.* at ¶ 53. Despite these advantages, the Defendant never voluntarily ceased his criminal activity, nor did he seek help before he knew that law enforcement had caught him red-handed.

When evaluating this Defendant's history and characteristics, this Court must also consider the fact that this Defendant lied to Probation when he was interviewed for the PSR.

When asked about his history of substance abuse, the Defendant "denied having a history of problematic drinking."  PSR ¶ 79.  He made this statement to the Probation Officer knowing that he had been previously arrested and charged with Driving Under the Influence, stemming from an incident in which he was driving after 2:30 in the morning, and had a blood alcohol content of .133 – nearly twice the legal limit.  *Id.* at ¶ 39.  Even more damning, when interviewed two years earlier by Dr. Brennan, the Defendant reported "a history of excessive alcohol and marijuana use throughout most of his adult life."  *See* PsychoSexual Risk Assessment, June 11, 2019 ("Assessment") page 6.  In fact, he told Dr. Brennan that he consumed alcohol, "often to the point of blacking out, on a weekly basis from ages of 22 to 28."  *Id.*  Thus, it seems clear that this Defendant is someone that has no qualms about making intentionally false statements to an Officer of the Court, when he believes it is in his best interests to do so.

It should also concern the Court that this Defendant has undergone polygraphs on a quarterly basis as part of a treatment program he began in September of 2020, but he chose to provide only two test results to the Probation Officer when interviewed for the PSR.  *Id.* at ¶¶ 71-74. In the two results that were provided, no deception was indicated.  However, if the Defendant has been in this program for over a year, there should be at least four test results.  It seems that had no deception been indicated on the other tests, in which the Defendant was asked questions about viewing images of minors and masturbating to them, those results would have been provided for the Court's consideration, as well.

The Government acknowledges that the Defendant has no prior criminal record. However, his lack of a criminal history was accounted for when determining the applicable Guidelines range.  Therefore, it should not serve as a reason to vary from a Guidelines sentence in this case.  Furthermore, as this Court is well-aware, the online sexual exploitation of children

is a crime that is committed in secret.  This secrecy, combined with the overwhelming presence

of digital devices and the near universal access to the internet, makes detection of these criminal

offenses difficult.  This is illustrated by the facts and circumstances that brought this offender

before the Court in the instant matter.  By his own admission, the Defendant was searching out

and downloading child sexual abuse material for "a few years" before law enforcement caught

up to him.  Over the course of a few short months, law enforcement and countless others were

able to download hundreds of videos from this offender, depicting prepubescent little girls

sometimes tied down to beds, being orally and vaginally raped by adult men.

When dealing with these types of criminal offenses, the lack of an arrest record holds

little significance because it is well-known that children often do not disclose sexual abuse, and

that these types of crimes are wildly underreported.  *See United States v. Gregory Todd Numan*,

3:160cr000065(TMB)(DAK)(February 26, 2018:  Expert Testimony of Clinical Psychologist

Darrell Turner).  In *Numan*, Dr. Turner provided expert testimony to the Court to explain why a

reliance on the lack of prior criminal history of an offender charged with sexual offenses

committed against children does not serve as a reliable indicator of their future risk for

reoffending.  As explained by Dr. Turner:

> "One of the main problems is the fact that these offenses
> are among the most undetected offenses that there are. This
> is not like bank robbery or murder, where it's generally assumed
> and expected that it's going to be detected and reported. We know
> from research that about only about five percent of sexual offenses against
> children are ever reported.
>
> Of those, of that five percent, about another five percent
> result in a conviction. So we're talking about an exponentially
> small number of offenses that are reported and accounted for.
> So it's sort of akin to saying there were only four drunk people in
> New Orleans in Mardi Gras this year because there were only four

> arrests for public intoxication, and it's not a good representation of what's
> actually going on out there. So to say it without the qualifier that,
> hey, this is a gross underestimate, but you know, so far, this is what
> we've been able to find, I think, is misleading and very, very
> dangerous."

at pages 22-23.  *See also* K. London, M. Bruck, S. J. Ceci & D. W. Shuman, *Disclosure of Child Sexual Abuse: What Does the Research Tell Us About the Ways Children Tell?*, 11 PSYCHOLOGY, PUB. POL'Y & L. 1, 194-226 (American Psychological Association, 2005)(finding in a study of adult retrospective victim studies about child sex abuse, approximately 60 – 70% of adults sexually abused as children did not recall disclosing the abuse during childhood); *See also* D. W. Smith, E. J. Letourneau, B. E. Saunders, D. G. Kilkpatrick, H. S. Resnick & C. L. Best, *Delay in Disclosure of Childhood Rape: Results from a National Survey*, 24 CHILD ABUSE & NEGLECT 2, 273-87 (2000)(the results of the study found that only 12% of child rape victims' assaults were reported to law enforcement authorities.).  As such, the fact that the Defendant lacks a criminal record, given the ways in which these types of crimes are committed and the reluctance and inability of the victims to disclose, should be given less weight, given the nature of the offense he is currently charged with.

**C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and Provide Just Punishment for the Offense**

This factor is known as the "just desserts" concept, answering the need for retribution so that the punishment fits the crime and the defendant is punished justly.  *See United States v. Irey*, 612 F.3d 1160, 1206 (11th Cir. 2010).  The *Irey* court cited the Senate Report regarding this provision:

> This purpose--essentially the "just desserts" concept--should be reflected clearly in
> all sentences; it is another way of saying that the sentence should reflect the gravity
> of the defendant's conduct.  From the public's standpoint, the sentence should be of
> a type and length that will adequately reflect, among other things, the harm done or

threatened by the offense, and the public interest in preventing a recurrence of the offense.   (quoting S.Rep. No. 98-225, at 75-76, 1984 U.S.C.C.A.N. 3258-59).

*Id.*

Trafficking in child pornography is a particularly serious offense, which has lifelong, devastating consequences for the children depicted in the child abuse material. Once distributed over the Internet, images and videos depicting the sexual abuse of a child will circulate in perpetuity because individuals, like the Defendant, made repetitive and purposeful decisions to seek out, download, view, and possess this disturbing material for their own sexual gratification. The Defendant's conscious decision to allow others to access the material that he was actively seeking out contributed to the continuing trauma experienced by the abused children depicted in these images and videos.

Furthermore, consumers of child pornography, such as the Defendant, create a market and demand for the production of these images and videos, which depict the sexual abuse and exploitation of real children.  These consumers therefore contribute to the cycle of abuse and are in part responsible for the harm suffered by children used to produce the images and videos in their collections.  *See United States v. Goff,* 501 F.3d 250, 259-260 (3d Cir. 2007) ("Children are exploited, molested, and raped for the prurient pleasure of [defendant] and others who support suppliers of child pornography").  In *United States v. Goldberg,* the Seventh Circuit stated:

> The district judge was influenced by the erroneous belief that a sentence affects only the life of the criminal and not the lives of his victims.  Young children were raped in order to enable the production of the pornography that the defendant both downloaded and uploaded-both consumed himself and disseminated to others. The greater the customer demand for child pornography, the more that will be produced. [Citations omitted].

491 F.3d 668, 672 (7th Cir. 2007).

Thus, even if consumers of child pornography do not themselves molest children, their actions contribute to the abuse of children.  The Defendant's active consumption and sharing of child abuse materials includes images depicting the abuse of prepubescent children, including violent videos showing children being raped while they are tied and bound.  With respect to 18 U.S.C. § 3553(a)(2)(A), a sentence of between 97 to 121 months would provide "just punishment" for the Defendant's offenses, promote respect for federal child exploitation laws, and reflect the seriousness of his offenses and child pornography offenses in general.

### D.  The Need for the Sentence Imposed to Afford Adequate Deterrence

Congress, the Supreme Court, and the Sentencing Commission believe general deterrence is a very important factor when considering an appropriate sentence.  *See United States v. Fry*, 851 F.3d 1329, 1332 (D.C. Cir. 2017) (the sentence would deter Fry and "others who may be inclined in doing similar kinds of things."); *see also United States v. Ferber*, 458 U.S. 747, 760 (1982) ("The most expeditious if not the only practical method of law enforcement may be to dry up the market for [child pornography] by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product"); *Osbourne v. Ohio*, 495 U.S. 102, 109-10 (1990) ("It is also surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand"); *United States v. Goff*, 501 F.3d 250, 261 (3rd Cir. 2007) ("Deterring the production of child pornography and protecting the children who are victimized by it are factors that should have been given significant weight at sentencing."); *United States v. Barevich*, 445 F.3d 956, 959 (7th Cir. 2006) ("Transporting and receiving child pornography increases market demand.  The greater concern under the Guidelines is for the welfare of these exploited children.  The avenue Congress has chosen to weaken the child pornography industry is to punish those who traffic in it.").

18 U.S.C. § 3553(a)(2)(B) dictates that a sentence of between 97 and 121 months is appropriate because the Defendant's sentence should be lengthy in order to deter the criminal conduct of others. As stated in *Goldberg*, "[s]entences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor. The logic of deterrence suggests that the lighter the punishment for trafficking in child pornography, the greater the customer demand for it and so the more will be produced." 491 F.3d at 672. *See also Goff*, 501 F.3d at 261 (stating in child pornography possession case that "deterring the production of child pornography and protecting the children who are victimized by it are factors that should have been given significant weight at sentencing").

As such, this Court is in the position to send a loud and clear message to those individuals, like the Defendant, who share a morbid fascination and sexual gratification in watching the sexual abuse of very young children. This is a serious crime of violence which warrants a Guidelines sentence.

**E. The Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant**

A sentence of between 97 and 121 months is necessary in order to protect the public from further crimes of this Defendant. As detailed above, child pornography offenses present a serious danger to the community which results in severe mental, emotional, and physical trauma to the countless number of children who are victimized by offenders like the Defendant and others with a demonstrated sexual interest in children. It is this type of harm that led Congress to create mandatory minimum sentences for these types of offenses.

When fashioning a sentence, Courts should consider that sex offenders have a high rate of recidivism. *See Lombard v. United States*, 44 F. Supp. 3d 14, 26 (D.D.C. 2014) (noting that the lower court's concerns about recidivism was supported by substantial authority (citing *Smith v.*

*Doe,* 538 U.S. 84, 103, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003) ("The risk of recidivism posed by sex offenders is frightening and high.") (citations omitted); *McKune v. Lile,* 536 U.S. 24, 33, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002) (noting that "[w]hen convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault"); *United States v. Irey,* 612 F.3d 1160, 1214 (11th Cir.2010) ("[T]he threat of recidivism by a pedophile who has sexually abused a child is appalling.") (citation and quotation marks omitted); *United States v. Allison,* 447 F.3d 402, 405–06 (5th Cir.2006) ("Congress explicitly recognized the high rate of recidivism in convicted sex offenders, especially child sex offenders.")); *see also United States v. Allison*, 447 F.3d 402, 405-406 (5th Cir. 2006) (Congress explicitly recognized the high rate of recidivism in convicted sex offenders, especially child sex offenders). Indeed, As Judge Posner recently wrote:

> We need evidence-driven law just as we need evidence-driven medicine. Statistical analysis of sex crimes has shown that the best predictor of recidivism is not deportment at an interview but sexual interest in children. R. Karl Hanson, Kelley E. Morton & Andrew J.R. Harris, "Sexual Offender Recidivism Risk: What We Know and What We Need to Know," 989 Annals of the N.Y. Academy of Sciences 154, 157 (2003) (tab.1). Some studies show a high rate of recidivism among pedophilic sex offenders generally, ranging from 10 percent to 50 percent. Ryan C.W. Hall & Richard C.W. Hall, "A Profile of Pedophilia: Definition, Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensic Issues," 82 Mayo Clinic Proceedings 457, 467 (2007). Another study found that only 6.8 percent of consumers of child pornography had been charged with a new child-pornography offense within 4 years but that the percentage rose to 9.5 percent within 6 years. Angela W. Eke, Michael C. Seto & Jennette Williams, "Examining the Criminal History and Future Offending of Child Pornography Offenders: An Extended Prospective Follow-up Study," Law & Human Behavior, Nov. 19, 2010 (tab.1), www.springerlink.com/content/h4616862621x8616/ (visited June 23, 2011).

*United States v. Garthus*, 552 F.3d 715, 720 (7th Cir. 2011).

A recent report by the Sentencing Commission reemphasized the need for strong sentences to deter individuals and to protect the public from these types of offenders. *See*

https://www.ussc.gov/research/research-reports/federal-sentencing-child-pornography-non-production-offenses.  This new report reflects upon the Commission's report from 2012, and compiles data from 2019.  The Commission emphasized the seriousness of non-production offenses, noting that child pornography offenses normalize the sexual abuse of children and may promote existing tendencies towards sex offending and the production of new images.  *See* Report at page 1.  Disturbingly, the Commission's report detailed findings that, after tracking over 1,000 child pornography offenders who had been released, 27.6 perfect were rearrested within three years.  *See* Report at page 7.  Such a statistic is probably lower than the true percentage that recidivate, because it only measures re-arrests- not offending behavior.  For these reasons, it is clear that the Defendant's course of criminal conduct created a threat to the most vulnerable members of the public. As such, a Guidelines sentence is necessary to protect the public from further crimes by this Defendant.

**F. The Need to Avoid Unwarranted Sentence Disparities among Defendants with Similar Records Who Have been Found Guilty of Similar Conduct**

Section 3553(a)(6) directs courts to consider avoiding *unwarranted* disparities among defendants "with similar records who have been found guilty of similar conduct." It "does not require the district court to avoid sentencing disparities between defendants who might not be similarly situated." *United States v. Mattea*, 895 F.3d 762, 768 (D.C. Cir. 2018) (quoting *United States v. Guillermo Balleza*, 613 F.3d 432, 435 (5th Cir. 2010).

While it is true that other offenders sentenced in this District on charges related to the Possession of Child Pornography have received sentences below the Guidelines sentence that the Government is requesting, imposing a Guidelines sentence in this case would not create an unwarranted disparity.  *See United States v. Adam Chazin*, 21-cr-76 (D.D.C.)(sentenced to 28 months after a pleading guilty to possession of child pornography) and *United States v. Brian*

*Kampel*, (D.D.C.)(sentenced to 33 months after pleading guilty to possession of child pornography).  However, neither of those cases involved offenders who, in addition to possessing and accessing child sexual abuse material, were also distributing the abusive content by making their files available to other offenders.  As such, a sentence more commensurate with cases involving the distribution of child pornography is more appropriate.  *See United States v. Jones*, 846 F.3d 366, 372 (D.C. Cir. 2017) ("When an offense is uniquely serious, courts will consider the need to impose "stiffer sentences" that "justif[y] the risk of potential disparities."); *see also United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) (concluding that a within-Guidelines sentence for a child-pornography offense did not produce an unwarranted disparity when the  images distributed by the defendant "were much more aggressive and troubling than the images distributed by other offenders" who received lesser sentences).  Indeed, Probation's Sentencing Recommendation for this Defendant is 51 months which, while not in the Guidelines range, is higher than sentences that have been previously recommended for individuals convicted of the Possession of Child Pornography.  Therefore, given the facts and circumstances of this case, a Guidelinges sentence would not create unwarranted sentencing disparities.

### III.     Dr. Brennan's Report Should be Excluded from Consideration at Sentencing

The Court should not consider Dr. Brennan report when fashioning an appropriate sentence for the Defendant for several reasons.  First, the report relied exclusively on the Defendant's self-serving statements, which are inconsistent with the evidence in this case.  *See* Psychosexual Risk Assessment, June 11, 2019 ("Assessment")(noting that the Defendant's background history was derived mainly from his self-report. Criminal investigation reports and other evidence from the government were not made available to this examiner by the date of this report).  Secondly, the Assessment omits several crucial and disturbing findings and conclusions

that were derived from the various testing instruments that Dr. Brennan chose to administer. Finally, the tools that Dr. Brennan chose to administer are widely criticized and/or are specifically not to be used in the type of Assessment he conducted.  As a result, the conclusions that Dr. Brennan reaches are not empirically based and are inherently unreliable.

Dr. Brennan could have obtained the police investigative reports, the forensic analysis documents, and the results from the Defendant's prior polygraphs from either defense counsel or from the Government, the same way that the Probation Officer did when writing the PSR.  Dr. Brennan could have also viewed the images and videos that this Defendant sought out and shared with other like-minded offenders, to determine for himself that age of the children that this Defendant is sexually attracted to.  Taking any of these steps would have afforded Dr. Brennan the opportunity to test the accuracy and veracity of the Defendant's self-reporting.  Dr. Brennan failed to do any of these things, instead he seems to have just taken the Defendant's word for it.

Dr. Brennan's lack of source and background information is incredibly concerning for several reasons.  First, as this Court is now aware, this is a Defendant who has made false statements to the Probation Officer when he was interviewed for the PSR.  Beyond that, this is an offender who failed a polygraph examination administered in June of 2018.[2]  During the polygraph, which was administered by a trained, FBI Agent, the Defendant was asked "As an adult, have you had sexual contact with a child in any way?"  PSR ¶ 76.  When the Defendant answered "No", deception was indicated.  *Id.*  When asked in the post-polygraph interview about this answer, the Defendant provided some story about having sex with an adult prostitute in

---

[2] There is no indication from Dr. Brennan's report that he was aware the Defendant had taken a polygraph one year prior to his Assessment, and that there was evidence that the Defendant did not answer questions regarding his sexual contact with minors truthfully.

Thailand, which is in no way responsive or related to the question about his sexual contact with children. *Id.* at ¶ 77. This suggests he was not honest in the post-polygraph interview, either.

What is perhaps the most alarming is that Dr. Brennan based his opinions and conclusions solely on this Defendant's self-reporting, when he knew that the very tests he had administered to this offender showed that this Defendant has a propensity towards not telling the truth. For example, in the Millon Clinical Multiaxial Inventory IV ("MCMI-IV"), the Report generated from the responses given by the Defendant informed Dr. Brennan that this offender possesses "a distinct tendency toward avoiding self-disclosure is evidence in this patient's response style." *See* MCMI-IV, page 2 (Attached as Exhibit 1, Filed under Seal). This avoidance of self-disclosure may signify a categorical evasiveness. *Id.* at page 5. Similarly, on the Abel Assessment, on the Social Desirability Score, the Defendant received an 80. *See* Abel Assessment (Attached as Exhibit 2, Filed Under Seal). Scores over 65 are considered highly problematic. *Id.* at page 11. A high score can indicate a person's inability to be truthful to others. *Id.* Dr. Brennan never mentioned these concerns with the Defendant's veracity in his Report which has been provided to the Court. To the contrary, Dr. Brennan falsely claimed that the Defendant's profile reflected a "truthful approach to testing." *See* Assessment, page 7.

It is also concerning that Dr. Brennan relied on instruments, such as the Abel Assessment, that have been widely criticized by the Courts. *See* PSR ¶ 67. Federal courts in both the Eighth and Ninth Circuits have rejected use of the Abel Assessment as inadmissible. In *United States v. White Horse*, 177 F. Supp.2d 973 (D.S.D. 2001), aff'd, 316 F.3d 769 (8th Cir. 2003), the Court held that the Abel Assessment failed to meet Daubert[3] admissibility standards

---

[3] *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993).

(1) because Part One of the Assessment carries a high rate of error and has failed to achieve widespread acceptance within the scientific community, 177 F. Supp.2d at 975-76; and (2) because Part Two of the Assessment has been neither subjected to peer review nor widely accepted within the scientific community. Id. at 976-77.

   In the course of a thorough and careful analysis, the *Birdsbill* court held that the. Abel Assessment was irrelevant to the question of whether a defendant had sexually abused children, because the Assessment is a psychiatric instrument designed to be used only for *treatme*nt, not for diagnostic purposes, and not to detect whether a person has sexually abused children. *United States v. Birdsbill*, 243 F. Supp.2d 1128, 1131 n.3 (D. Mont. 2003), aff'd, 97 Fed. Appx. 721 (9th Cir. 2004). "'There has never been a claim that The Abel Assessment could be used to screen pedophiles from normals.'" *Id.*[4] quoting *Ready v. Massachusetts*, 2002 WL 1255800 (Mass. Super. Ct. May 17, 2002, *quoting* Dr. Gene G. Abel, Letter to the Editor, *Sexual Abuse: A Journal of Research & Treatment*, *aff'd*, 824 N.E.2d 474 (Mass. App. Ct. Mar. 24, 2005)). Finally, relying upon *Ready* and the numerous scholarly sources cited therein, *Birdsbill* held that the formula underlying the Abel Assessment "remains merely an untested and unproven theory," 243 F. Supp.2d at 1134, because "[e]ssentially, there have been no independent studies conducted for the purpose of verifying the theory underlying the [Abel Assessment Assessment]." Id. at 1135. In addition, *Birdsbill* held that the Abel Assessment's "error rate makes it a highly unreliable instrument, particularly in the hands of a moderately intelligent

---

[4] The district court noted that "Dr. Abel's own study of the Abel Assessment concludes that almost one quarter of admitted pedophiles were inaccurately classified as non-pedophiles." *White Horse,* 177 F. Supp. 2d at 975 (citing Gene Abel et al., *Screening Tests for Pedophilia*, 21 Crim. Just. & Behavior 115-31 (1994)).

subject bent upon manipulating the test results," and that the Assessment does not enjoy general acceptance within the scientific community. *Id.* at 1136.

It is similarly problematic that Dr. Brennan relied on the CPORT when he conducted the Assessment.  The Child Pornography Offender Risk Tool ("CPORT") was developed to predict all types of sexual recidivism, including contact and non-contact child pornography offenses. Currently there is no empirical support for the use of the CPORT when individuals are charged, but not yet convicted, of these types of offenses.  *See* Seto, M. C., & Eke, A. W. (2015). Predicting Recidivism among Adult Male Child Pornography Offenders: Development of the Child Pornography Offender Risk Tool (CPORT). Law and Human Behavior, 39, 416-429. And yet, that is the situation in which Dr. Brennan decided to administer this test.  Furthermore, the CPORT has yet to be sufficiently validated to support the determination of specific risk levels or the characterization of relative re-offense risk for individual offenders.  *Id.*   Because of this, the developers of the CPORT recommend that, at this time, the instrument be used solely for the purpose of ranking offenders according to their relative risk scores to aid in case management, supervision, and prioritizing treatment goals, rather than as a measure of whether or not this Defendant is a risk to reoffend upon release, which is what Dr. Brennan attempted to do in the Assessment provided to the Court.

While the United States Sentencing Guidelines permits this Court at Sentencing to consider "relevant information without regard to its admissibility under the rules of evidence applicable at trial," that information must have "sufficient indicia of reliability to support its probable accuracy."  U.S.S.G. § 6A1.3(a).  *United States v. James,* Crim. No. 17-184 (RJL), 2019 WL2516413, at *1 (D.D.C. June 18, 2019) (noting that sufficient extrinsic corroboration was necessary before Court would consider evidence at sentencing).  An expert's report may be

excluded from consideration at Sentencing if it 1) "does not demonstrate or disclose sufficient facts or data on which [the expert's] conclusion is based"; 2) "does not disclose reliable principles and methods from which [the expert's] conclusion is drawn"; and 3) "does not demonstrate that [the expert] applied reliable principles and methods reliably to the facts of the case." *Estate of Gaither ex rel. Gaither v. District of Columbia*, Civ. No. 03-1458(CKK)(AK), 2008 WL 5869878, at *3–4 (D.D.C. July 30, 2008).

The District of Columbia Circuit's ruling in *United States v. Day* is also instructive on this issue. *See United States v. Day,* 524 F.3d 1361 (D.C. Cir. 2008). In *Day*, the court affirmed the District Court's decision to exclude expert testimony, due to the expert's failure to articulate what he "concluded from any individual test result, interview, or expert report," making it "virtually impossible for the Government to engage" with the evidence. *Id.* at 1371–72. In the present case, Dr. Brennan did not include accurate facts to support his conclusion, and he did not use reliable methodology. This report was based almost exclusively on the Defendant's self-reporting, which was not verified through the use of a polygraph, and which is at odds with the evidence in this case. By choosing to ignore the evidence in this case; relying solely on the self-reporting of an individual with credibility problems; and by administering tests which have been widely criticized and which are not designed to facilitate the type of Assessment that Dr. Brennan provided to this Court, Dr. Brennan precluded the Government from being able "to engage [] meaningful[ly]" with the conclusions he drew in the instant case. *See id.* at 1372. As a result, this report lacks the corroborative evidence necessary to allow the Court to sufficient rely on any conclusions it espouses. For all of these reasons, the Government asks that this Court exclude Dr. Brennan's report from consideration at Sentencing.

## IV.  **If Dr. Brennan's Report is Considered, it Should be Given Little Weight**

As noted by Judge Posner, "the best predictor of recidivism is not deportment at an interview but sexual interest in children." *United States v. Garthus*, 552 F.3d 715, 720 (7th Cir. 2011) *citing* R. Karl Hanson, Kelley E. Morton & Andrew J.R. Harris, "Sexual Offender Recidivism Risk: What We Know and What We Need to Know," 989 Annals of the N.Y. Academy of Sciences 154, 157 (2003).  As detailed fully above, there is simply no empirical, credible basis for the conclusion that Dr. Brennan reached that this Defendant lacks a pedophilic disorder, and that he is more aptly characterized as having a "biologically normal level of sexual interest in female and male adults, as well as postpubescent adolescent females, ages 14 to 17." *See* Assessment, page 10.  According to the DSM V, a diagnosis of Pedophilic Disorder requires all of the following criteria to be met:

a. Over a period of at least six months, recurrent, intense, sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children (generally age thirteen years or younger).

b. The individual has acted on these sexual urges, or the sexual urges or fantasies cause marked distress or interpersonal difficulty.

c. The individual is at least sixteen years and at least five years older than the child or children in Criterion A.

*See* "The Diagnostic and Statistical Manual of Mental Disorders (5th edition; American Psychiatric Association, 2013).  In the present case, the Defendant informed Dr. Brennan that he started seeking out child pornography in his mid-30's.  *See* Assessment, page 2.  He admitted that he was downloading images and videos depicting girls as young as 12-14 years old, and he would masturbate to these sexually abusive materials.  *Id.*  He further admitted to broadening this

age range, and that he would seek out and masturbate to materials depicting the sexual abuse of girls as young as 8. *Id.* at page 5. When interviewed by Dr. Brennan, this offender indicated that he used words like "pre-teen" to seek out this material, and that he did so over the course of three years. *Id.* This Defendant's own statements make clear that he meets all of the criteria for a diagnosis of Pedophilic Disorder, and Dr. Brennan's conclusions to the contrary are preposterous.

It's also deeply disturbing that Dr. Brennan seems to link the Defendant's criminal behavior to this offender's unsubstantiated claims that he suffers from PTSD and Depression. *See* Assessment, page 8. Curiously, neither one of these diagnoses was suggested by any of the instruments that Dr. Brennan administered. Instead, the MCMI-IV listed this Defendant's possible diagnoses as: Unspecified Personality Disorder (Turbulent) Type, Histrionic Personality Style, and Compulsive Personality Style. *See* Exhibit 1, at page 2. Furthermore, research has repeatedly found that there is no link between various mental health disorders, including PTSD and Depression, and the commission of child pornography offenses. Recently, in the case of *Untied States v. Brian Kampel*, here in the District of Columbia, Dr. Darrell Turner testified that:

> "And then finally, there's a tendency to take something like depression or PTSD or anxiety and say, ah, that's why they were looking at child pornography, that's why, it's because they're anxious or it's because they're depressed, when in fact there is zero research that shows any correlation between any mental disorder, other than pedophilia, and being sexually attracted to children or looking at child pornography, which is good news for those of us that deal with depression or anxiety We don't have to wake up and wonder if we're going to start uncontrollably looking at child pornography that day. There is no link between those other mental disorders and looking at child pornography or being sexually attracted to children."

> *See United States v. Brian Kampel*, 20-cr-84(D.D.C.)(July 21, 2021)(page 38).

## V.   __Conclusion__

The Government submits that a Guidelines sentence, between 97 and 121 months

is a reasonable sentence in this case and is "sufficient, but not greater than necessary to

comply with the purposes" of sentencing.  18 U.S.C. § 3553(a).


Dated: October 29, 2021                    Respectfully submitted,
                                           CHANNING D. PHILLIPS
                                           ACTING UNITED STATES ATTORNEY


                                            _/s/_ _Amy E. Larson_____
                                           Amy E. Larson, N.Y. Bar Number 4108221
                                           Assistant United States Attorney
                                           555 Fourth Street, N.W.
                                           Washington, D.C. 20530
                                            Telephone: (202) 252-7863
                                            Email: Amy.Larson2@usdoj.gov